

**ORIGINAL**

AO 243 (Rev. 09/17)

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT**

**SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| **United States District Court** | District |
|---|---|

| Name *(under which you were convicted)*: Maximiliano Bonilla (Maximiliano Bonilla-Orozco) | Docket or Case No.: 08-CR-00140 |
|---|---|
| Place of Confinement: FCI Estill, P.O. Box 699, Estill, SC 29918 | Prisoner No.: 77018-053 |

| UNITED STATES OF AMERICA | Movant *(include name under which convicted)* |
|---|---|
| v. | Maximiliano Bonilla (Maximiliano Bonilla-Orozco |

**MOTION**

1.　(a) Name and location of court which entered the judgment of conviction you are challenging:

United States District Court Eastern District of New York (Brooklyn)
United States Courthouse
225 Cadman Plaza East, Room 1185
Brooklyn, NY 11201

　　(b) Criminal docket or case number (if you know):  08-CR-00140

2.　(a) Date of the judgment of conviction (if you know):  October 19, 2016

　　(b) Date of sentencing:  October 19, 2016

3.　Length of sentence:  A total term of twenty (20) years with a Supervised Release term of five (5) years.

4.　Nature of crime (all counts):

Count 1: Conspiracy to distribute cocaine in violation to
　　21 U.S.C. §960(a)(3)

5.　(a) What was your plea? (Check one)

　　(1) Not guilty ☐　　　(2) Guilty ☒　　　(3) Nolo contendere (no contest) ☐

6.　(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.　If you went to trial, what kind of trial did you have? (Check one)　　Jury ☐　　Judge only ☐

7.　Did you testify at a pretrial hearing, trial, or post-trial hearing?　　Yes ☐　　No ☒

AO 243 (Rev. 09/17)

8.  Did you appeal from the judgment of conviction?     Yes ☐     No ☒

9.  If you did appeal, answer the following:

(a) Name of court: _____

(b) Docket or case number (if you know): _____

(c) Result: _____

(d) Date of result (if you know): _____

(e) Citation to the case (if you know): _____

(f) Grounds raised:

(g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☐     No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

(5) Grounds raised:

10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
Yes ☐     No ☒

11.  If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

AO 243 (Rev. 09/17)

(4)   Nature of the proceeding: _____

(5)   Grounds raised:

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐    No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(b)   If you filed any second motion, petition, or application, give the same information:

(1)   Name of court: _____

(2)   Docket of case number (if you know): _____

(3)   Date of filing (if you know): _____

(4)   Nature of the proceeding: _____

(5)   Grounds raised:

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐    No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(c)   Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)   First petition:     Yes ☐     No ☐

(2)   Second petition:   Yes ☐     No ☐

(d)   If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

AO 243 (Rev. 09/17)

12.  For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** The Movant is "actually innocent" of conspiring to distribute cocaine "into the United States of America."

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The Movant is "actually innocent" because Congress "never intended" for 21 U.S.C. §960 to apply to the possession of cocaine "outside United States territory" with the "intention to distribute" cocaine "outside of the territorial jurisdiction" of the United States of America. There is "NO" evidence that proves beyond a reasonable doubt that the Movant "intended to distribute" cocaine "into the United States of America" The Movant "did not know" and "was never told" that this is a "crucial element" that has to be satisfied in order to convict him under 21 U.S.C. §960.
(see Supportive Memorandum at Law).

(b)  Direct Appeal of Ground One:

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☐

(2)  If you did not raise this issue in your direct appeal, explain why:

(c)  Post-Conviction Proceedings:

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☒

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

AO 243 (Rev. 09/17)

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐        No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

<br>

**GROUND TWO:**  The Movant was denied his Sixth Amendment Right to Effective
Assistance of Counsel.

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The "FACTS" supporting Ground Two of this Motion are accurately
set forth in the Memorandum at Law (Attached)

<br>

(b)  **Direct Appeal of Ground Two:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐        No ☐

AO 243 (Rev. 09/17)

    (2)  If you did not raise this issue in your direct appeal, explain why:

**(c) Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

AO 243 (Rev. 09/17)

**GROUND THREE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐

AO 243 (Rev. 09/17)

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND FOUR:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Four:**

   (1)  If you appealed from the judgment of conviction, did you raise this issue?

       Yes ☐     No ☐

   (2)  If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

   (1)  Did you raise this issue in any post-conviction motion, petition, or application?

       Yes ☐     No ☐

   (2)  If you answer to Question (c)(1) is "Yes," state:

AO 243 (Rev. 09/17)

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

13. Is there any ground in this motion that you have **not** previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

```
GROUND ONE has never been presented in any Federal Court because
the Movant "did not know" -and "was never told"- that to be convicted
under 21 U.S.C. §960 he had to import cocaine into the United
States of America.
GROUND TWO has never been presented in any Federal Court because
the Movant was denied effective assistance of cousel.
```

AO 243 (Rev. 09/17)

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?      Yes ☐      No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing: Humberto R. Dominguez
150 West Flager St, Penthouse 2850, Miami, Fl
33130

(b) At the arraignment and plea: Jesse M. Siegel
233 broadway, Suite 2701, New York, NY 10279

(c) At the trial:

(d) At sentencing:       Jesee M. Siegel
233 Broadway, Suite 2701, New York, NY 10279

(e) On appeal:

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☐      No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐      No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?      Yes ☐      No ☐

AO 243 (Rev. 09/17)

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

A MOVANT CAN OVERCOME the One-Year statute of limitations for filling a §2255 Motion by asserting a credible claim of Actual Innocence (see McQuiggin v. Perkins, 559 U.S. 383, 386, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013). To establish actual innocence, the Movant must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Id. (Citing Schlup v. Delo, 513 U.S. 298, 329, 155 S. Ct. 851, 130 L. Ed. 2d 808 (1995)).

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:
  A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –
    (1)  the date on which the judgment of conviction became final;
    (2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
    (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
    (4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 09/17)

Therefore, Movant asks that the Court grant the following relief:

Since the "CONDUCT" for which the Movant has been convicted, does not violate 21 U.S.C. §960, the Movant, therefore, has committed "no crime against the United States of America." For this reason, the Movant, most humbly and respectfully, asks Honorable United States District Judge, Sandra L. Townes, to grant him time served.

_____

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _October 30, 2019_____.
(month, date, year)

Executed (signed) on October 30, 2019 _____ (date)

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT COURT OF NEW YORK

(BROOKLYN)


MAXIMILIANO BONILLA

MAXIMILIANO BONILLA-OROZCO

      MOVANT,

         V.                      Case No. 08-CR-00140

UNITED STATES OF AMERICA

      RESPONDENT.


MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR

CORRECT SENTENCE UNDER TITLE 28 U.S.C. §2255.


Comes now Maximiliano Bonilla (True Name: Maximiliano Bonilla-Orozco), hereinafter the Movant ProSe, who most humbly and respectfully submits this Memorandum of Law in support of Motion to Vacate, Set Aside, or Correct Sentence under Title 28 U.S.C. §2255.


The Movant most humbly and respectfully asks this Honorable Court to construe his pleadings (for the Movant is unlearned to the Science of Law) **"liberally"** pursuant to the doctrine of **"Haines v. Kerner,"** 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) and **"broadly"** pursuant to the doctrine of **"Cruz v. Gomez"** 202 F.3d 593 (2nd Circuit 2000): "Courts most construe ProSe pleadings broadly, and interpret them to raise the strongest argument that they suggest" ("Pleadings must be construed as to do Justice").

- 1 -

"The care of human life and happiness, and not their destruction, is the 'first' and 'only' object of good government."

**President Thomas Jefferson**

The Grounds expressed below, involve a claim of "Actual Innocence" (see **Mc Quiggin v. Perkins**).

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 19, 2016, the Movant was sentenced to twenty (20) years in prison after pleading guilty to Count One of One: Conspiracy to distribute cocaine in violation to 21 U.S.C. §960(a)(3). The Movant did not appeal his conviction or sentence.

The Movant has timely submitted a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. §2255, where he raised a claim of "Actual Innocence" under two (2) Grounds which show the following:

## II. ARGUMENT

A. GROUND ONE: THE MOVANT IS "ACTUALLY INNOCENT" OF CONSPIRING TO DISTRIBUTE COCAINE "INTO THE UNITED STATES OF AMERICA."

The Movant alleges in Ground One of his §2255 Motion that is "actually innocent" because Congress "never intended" for 21 U.S.C. §960 to apply to the possession of cocaine "outside United States territory" with the "intention to distribute" cocaine "outside of the territorial jurisdiction" of the United States of America. There is "NO" evidence that proves beyond a reasonable doubt that the Movant "intended to distribute" cocaine "into the United States of

- 2 -

America." The Movant **"did not know"** - and **"was never told"** - that this is a **"crucial element"** that has to be satisfied in order to convict him under 21 U.S.C. §960.

To convict a defendant under 21 U.S.C. §960, the Government therefore must show **beyond a reasonable doubt** that a defendant **"possesses a culpable mental state"** regarding **"each one"** of the statutory elements of §960, that is, that the defendant **"intended"** or **"knew"** he possessed cocaine and **"also"** that he **"intended"**, **"knew"** or **"had reasonable cause to believe"** that cocaine was going to be unlawfully **"imported into the United States of America."**

By specifying that a defendant may be convicted **"only"** if he **"intentionally"** or **"knowingly"** violated 21 U.S.C. §960, Congress intended to require the Government to **"establish"** that the Movant **"intentionally"** or **"knowingly"** violated the material elements of 21 U.S.C. §960. For all of the above, the **"same principle"** that governs over 18 U.S.C. §922(g) and §924(a)(2) in **"Rehaif v. United States"** applies to the Movant's conviction under 21 U.S.C. §960 (see Exhibit D).

The terms **"intending,"** **"knowing"** and **"having reasonable cause to believe"** in 21 U.S.C. §959 modify the verbs **"manufactures"**, **"possesses"** and **"distributes"** and its direct object, which in the present case is 21 U.S.C. §960. The proper interpretation of the statute thus turns on what it means for a defendant to **"know"** that he has **"violated"** 21 U.S.C. §960. Therefore,  to convict the Movant for violating 21 U.S.C. §960, the following elements **"most be proved"**

beyond a reasonable doubt: **(1)** A status element **(Conspiracy to "distribute")**; (2) A manufacture element **("manufactures")**, and/or a possession element **("possesses")** and/or a distribution element **("distributes")**; (3) A jurisdictional element **(unlawfully "import into the United States of America")**; and (4) A controlled substances element **("cocaine")**. All these elements work as the links of one chain, if one of these links is missing, then the chain is broken and therefore, the material elements of §960 have not been satisfied, meaning that there has been **"no violation"** to 21 U.S.C. §960. Since the third element, **"the jurisdictional element" ("import into the United States of America")** is not satisfied, the Movant has **"not"** committed a crime against the United States of America, and therefore, the Movant's offense should be **"VACATED."**

Under 21 U.S.C. §960, Congress had **"NOT"** stated its intent of a conspiracy to possess controlled substances **"outside the territorial jurisdiction of the United States of America"** with intent to **"distribute"** those same controlled substances **"outside of the territorial jurisdiction of the United States of America."** Here, the **"same principle"** that governs over 21 U.S.C. §841(a)(1) and (b)(1)(A)(ii) and §846 in **"United States v. Lopez-Vanegas"** applies to the Movant's conviction under 21 U.S.C. §960 (see Exhibit A, Exhibit B and Exhibit C).

For the above reasons, since 21 U.S.C. §960 **"DOES NOT"** apply extraterritorially, the **"conduct"** of the Movant **"DID NOT"** violate the statutes of 21 U.S.C. §960, and since Congress **"HAS NOT"** specifically expressed its intent for 21 U.S.C. §960 to apply extraterritorially, the Movant **"HAS NOT"** committed a crime against

- 4 -

the United States of America and therefore, the Movant's offense should be "VACATED."

B. GROUND TWO: THE MOVANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BASED ON HIS LAWYER'S FAILURE TO ARGUE THAT THE MOVANT "NEVER DISTRIBUTED NOR EVER INTENDED TO DISTRIBUTE COCAINE INTO THE UNITED STATES OF AMERICA."

The Movant alleges in Ground Two of his §2255 Motion that he was denied his Sixth Amendment Right to effective assistance of counsel. He asserts that his lawyers were ineffective for failing to argue during the plea and sentencing process why the Movant was extradited if he had "NEVER" unlawfully "imported cocaine into the United States of America." The Movant wanted this Ground to be raised, but his lawyers constantly advised him that it was better to sign a plea agreement.

The Sixth Amendment to the United States Constitution provides that in criminal prosecutions the accused shall have the "right" to the assistance of counsel for his or her defense. The United States Supreme Court has held that this right "includes" the right to effective assistance of counsel (see McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)). Pursuant to this Constitutional Mandate, a defendant is entitled to "reasonably competent" assistance of counsel from "pre-plea investigation and preparation through advocacy at sentencing" (see U.S. v. Garcia, 698 F.2d 31, 33-34 (1st Circuit 1983)).

- 5 -

The United States Supreme Court has held that in order for a prisoner to show that counsel's assistance was so inneffective at the sentencing stage to warrant vacating or correcting a sentence under 28 U.S.C. §2255, the prisoner must show (1) that his counsel's acts or omissions made counsel's overall performance fall below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's errors, the prisoner would not have pleaded guilty (see Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); U.S. v. Pellerito, 878 F.2d 1535, 1538 (1st Circuit 1989); Giardino, 797 F.2d at 31; Hill v. Lockhart, 474 U.S. 52, 58 (1985)). Under the first prong of the above test, the prisoner must show that in light of all the circumstances present at the time of sentencing, counsel's acts or omissions "were outside the wide range of professionally competent assistance" (see Tejeda v. Dubois, 142 F.3d 18, 22 (1st Circuit 1998). Under the second prong, the prisoner must show a reasonable probability that, "armed with the correct information, the outcome would have been different" (see U.S. v. Vancol, 916 F. Supp. 372, 377 (D. Del 1996)).

In the Movant's case, his lawyers rendered inneffective assistance at the Movant's sentencing on the §960 charge because they failed to pursue a request for an evidenciary hearing, failed to demand an adequate factual basis for conspiracy to distribute cocaine in violation to 21 U.S.C. §960(a)(3), and because Movant acted under a conflict of interest. Accordingly, the Movant's sentence on 21 U.S.C. §960(a)(3) offense must be **"VACATED."**

### III. CONCLUSION

"Knowingly" means that the act was done "voluntarily" and "intentionally", not because of mistake or accident. "Knowledge" on the part of the Movant "cannot" be established merely by demostrating that the Movant was in possession of cocaine, therefore, since the Government "failed" to prove the Movant's "mens rea", his conviction must be "VACATED."

"It is necessary... to distinguish between producing a result intentionally and producing it 'knowingly'... Because there are several areas of the Criminal Law in which there may be good reason for distinguishing between one's 'objectives' and one's 'knowledge', the modern approach is to define separately the mental states of 'knowledge' and 'intent'. ...This is the approach taken in the Model Penal Code [§2.02(2)(a) & (b)]" (Wayne R. LaFave & Austin W. Scott Jr., "Criminal Law" 218 (2nd ed. 1986)).

The matter of proving beyond a reasonable doubt that the Movant had a guilty state of mind "required" by the statute's language and purpose of §960 is a "crucial element."

Convictions are based upon "FACTS" not "SUPPOSSITIONS". FACT: Something that actually exists; an aspect of reality (Black's Law Dictionary).

SUPPOSSITION: An "assumption" that something is true, "without proof" of its veracity (ibid) (see also: Corroborating Evidence, Credible Evidence, Critical Evidence, direct Evidence, Exculpatory Evidence,

Extrajudicial Evidence, Indispensable Evidence, etc.).

The fact is that the Movant "NEVER" imported cocaine "into the
United States of America." The Movant requested this Ground to be
raised even when then, the Movant "did not know" that the "jurisdictional
element" is a "crucial element" that has to be satisfied in order to
be convicted under 21 U.S.C. §960. Again, since the Movant did not
violate the statutes of 21 U.S.C. §960, the Movant (Maximiliano
Bonilla, true name: Maximiliano Bonilla-Orozco) is "innocent of this
crime," for he has "NEVER" violated the "jurisdictional element" of
21 U.S.C. §960, therefore, his conviction should be "VACATED."

In conclusion, if today the Movant was going to be prosecuted
under 21 U.S.C. §960, the Government "must prove beyond a reasonable
doubt" that the Movant had the "intention," "knowledge" or "had
reasonable cause to believe" that cocaine will be unlawfully "imported
into the United States of America."

For all of the above reasons and authorities, 21 U.S.C. §960 "DOES
NOT" apply to the possession "outside United States territory."
Furthermore, there can be "NO VIOLATION" of 21 U.S.C. §960 if the
object of the conspiracy is "not a violation of the substantive
offense." A violation to 21 U.S.C. §960 occurs "ONLY" when a person
conspires to commit any offense defined in the subchapter. Accordingly,
where the object of the conspiracy is to possess controlled substances
"outside the territorial jurisdiction of the United States of America
with the intent to distribute outside the United States," there is
"NO VIOLATION" of 21 U.S.C. §960 (see Exhibits A & B for a thorough

- 8 -

analysis concerning territorial jurisdiction). The Movant is **"innocent"** of this charge, for he has not committed a crime against the United States of America, therefore, his conviction should be **"VACATED."**

Finally, for all of the above, the Movant (Maximiliano Bonilla, true name: Maximiliano Bonilla-Orozco), most humbly and respectfully requests Honorable United States District Judge, Sandra L. Townes, to consider the §3553 factors that he presents in Exhibit E, as the Honorable Court makes its decision in the Movant's case.

The Movant closes his petition quoting the words of United States District Judge, Alvin K. Hellerstein, from his opinion 2005 U.S. Dist. Lexis 3076: "Rehabilitation is also a goal of punishment 18 U.S.C. §3553(a)(D), that a goal **"cannot"** be served if a defendant can look forward to nothing beyond imprisonment. **"HOPE"** is the necessary condition of mankind, for we are all created in the image of GOD. A Judge should be hesitant before sentencing so severely that he/she **"DESTROYS ALL HOPE"** and **"TAKES ALL POSSIBILITY OF USEFUL LIFE."** Punishment should not be more severe than that necessary to satisfy the goals of punishment." The Honorable Judge's words came when sentencing a defendant that could have been sentenced as a career offender, and was facing a sentence of 262 to 327 months, and the Judge found that a punishment of 168 months was a just punishment.

Respectfully Submitted,

October 30, 2019   Maximiliano Bonilla, ProSe

Maximiliano Bonilla-Orozco

Reg. No. 77018-053

## IV. VERIFICATION

I, Maximiliano Bonilla (True Name: Maximiliano Bonilla-Orozco), hereby verify that the information provided herein is true and accurate to the best of my knowledge under penalty of perjury 28 U.S.C. §1746; 18 U.S.C. §1621.

October 30, 2019        Maximiliano Bonilla, ProSe

Maximiliano Bonilla-Orozco

Reg. No. 77018-053

FCI Estill

P.O. Box 699

Estill, SC 29918


## V. CERTIFICATE OF SERVICE

I, Maximiliano Bonilla (true name: Maximiliano Bonilla-Orozco), hereby certify that on October 30, 2019, a true and correct copy of the foregoing was deposited in the Prison Legal Mailing System addressed to:

Assistant United States Attorney

Patricia E. Notopoulos

225 Cadman Plaza East

Brooklyn, NY 11201

Executed on this October 30, 2019.        Maximiliano Bonilla, ProSe

Maximiliano Bonilla-Orozco

Reg. No. 77018-053

FCI Estill

P.O. Box 699; Estill, SC 29918

- 10 -

EXHIBIT A

493 F.3d 1305: UNITED STATES V. LOPEZ-VANEGAS

JULY 26, 2007

U.S. COURT OF APPEALS 11th CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee, versus IVAN LOPEZ-VANEGAS, DORIS
MANGERI SALAZAR, Defendants-Appellants.
UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
493 F.3d 1305; 2007 U.S. App. LEXIS 17792; 20 Fla. L. Weekly Fed. C 920
No. 05-15021
July 26, 2007, Decided
July 26, 2007, Filed

**Editorial Information: Prior History**

{2007 U.S. App. LEXIS 1}
Appeals from the United States District Court for the Southern District of Florida. D.C. Docket No.
02-20548-03, 04-CR.

**Disposition:**

VACATED.

**Counsel**       For Lopez-Vanegas, Ivan, Appellant: Strafer, G. Richard, G. Richard
Strafer, P.A., MIAMI, FL.
           For Salazar, Doris Mangeri, Appellant: Srebnick, Howard M.,
Black, Srebnick, Kornspan & Stumpf, PA, MIAMI, FL.
           For Appellant: Srebnick, Scott Alan, Law Office of Scott Alan
Srebnick, MIAMI, FL.
           For United States of America, Appellee: Cornell, Robert B., U.S.
Attorney's Office, FORT LAUDERDALE, FL.
           For Appellee: Schultz, Anne R., Assist. US Attorney, Hirsch,
Lisa A., Schlessinger, Stephen, U.S. Attorney's Office, MIAMI, FL.

**Judges:** Before CARNES, WILSON and WALTER, * Circuit Judges.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Two defendants appealed their convictions from the United States District
Court for the Southern District of Florida for conspiracy to possess with the intent to distribute five
kilograms or more of a mixture and substance containing cocaine, in violation of 21 U.S.C.S. §§
841(a)(1) and (b)(1)(A)(ii) and 846. They asserted, inter alia, that the conduct for which they were
convicted did not violate 21 U.S.C.S. §§ 841 and 846.Defendants' convictions and sentences for
violating 21 U.S.C.S. §§ 841(a)(1) and (b)(1)(A)(ii) and 846 were vacated because their discussions in
the United States related to possession of controlled substances outside the United States with intent to
distribute those substances outside the United States did not violate the statutes.

**OVERVIEW:** The government alleged that defendants brokered a deal between a Colombian drug
trafficking organization headed by a named individual and a Saudi Arabian prince to transport cocaine on
the prince's airplane from Caracas, Venezuela to Paris, France, for distribution in Europe. The issue of
whether discussions occurring in the United States related to possession of controlled substances outside
of the United States with intent to distribute those substances outside of the United States was a crime in
the United States was res nova in the United States Eleventh Circuit. Under 21 U.S.C.S. §§ 841 and 846,
Congress had not stated its intent to reach discussions held in the United States in furtherance of a
conspiracy to possess controlled substances outside the territorial jurisdiction of the United States, with

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



intent to distribute those controlled substances outside of the territorial jurisdiction of the United States. Therefore, §§ 841 and 846 did not apply extraterritorially, and the conduct of defendants did not violate those statutes.

**OUTCOME:** The judgments of conviction and sentences issued by the district court were vacated.

**LexisNexis Headnotes**

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Delivery, Distribution & Sale > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Manufacture > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > Intent to Distribute > General Overview*

21 U.S.C.S. § 841 provides that it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Abandonment*

The failure to offer argument on issue on appeal results in abandonment of that issue.

*Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > General Overview*
*Governments > Legislation > Effect & Operation > General Overview*

Whether a criminal statute reaches a defendant's conduct is reviewed de novo.

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Delivery, Distribution & Sale > Conspiracy > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > Intent to Distribute > General Overview*
*Governments > Legislation > Effect & Operation > General Overview*

21 U.S.C.S. § 841(a)(1), in conjunction with 21 U.S.C.S. § 846, makes it unlawful for any person to conspire to possess with the intent to distribute a controlled substance, such as cocaine. Neither statute expressly requires that possession, distribution nor an act in furtherance of the conspiracy occur in the United States.

*Evidence > Inferences & Presumptions > Presumptions*
*Governments > Legislation > Effect & Operation > General Overview*
*Governments > Legislation > Interpretation*

A silent statute is presumed to apply only domestically. Such statutes may be given extraterritorial application if the nature of the law permits it and Congress intends it. Absent an express intention on the face of the statutes to do so, the exercise of that power may be inferred from the nature of the offenses and other legislative efforts by Congress to eliminate the type of crime involved.

*Governments > Legislation > Effect & Operation > General Overview*

B05_11CS                                   2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



*Governments > Legislation > Interpretation*

The United States Supreme Court explained the issues involved with a statute silent as to its extraterritorial application. The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in that regard.

*Governments > Legislation > Effect & Operation > General Overview*
*Governments > Legislation > Interpretation*

The rule of interpretation that applies to statutes that are silent as to their extraterritorial application should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Delivery, Distribution & Sale > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Delivery, Distribution & Sale > Conspiracy > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Manufacture > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > Intent to Distribute > General Overview*
*Governments > Legislation > Effect & Operation > General Overview*

The case law of the United States Eleventh Circuit and the other federal circuits has applied 21 U.S.C.S. §§ 841(a)(1) and 846 extraterritorially in certain circumstances, even though Congress has not specifically expressed its intent on the matter. However, in each of those cases some other nexus to the United States allows for extraterritorial application of 21 U.S.C.S. § 841(a)(1): defendants have either possessed or conspired to possess controlled substances within the United States, or have intended to distribute controlled substances within the United States. In the Baker decision, the United States Court of Appeals for the Fifth Circuit has made it clear that § 841(a)(1) does not apply to possession outside United States territory unless the possessor intends to distribute the contraband within the United States. Furthermore, there can be no violation of 21 U.S.C.S. § 846 if the object of the conspiracy is not a violation of the substantive offense. A violation of § 846 occurs when a person conspires to commit any offense defined in the subchapter. Accordingly, where the object of the conspiracy is to possess controlled substances outside the United States with the intent to distribute outside the United States,

B05_11CS                                    3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



there is no violation of 21 U.S.C.S. §§ 841(a)(1) or 846.

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Delivery, Distribution & Sale > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Manufacture > General Overview*
*Governments > Legislation > Effect & Operation > General Overview*

Congress has shown it is capable of addressing acts involving controlled substances occurring outside of the United States, and has shown it thinks it necessary to make specific provisions in the law that allow the locus to include acts of manufacture or distribution of controlled substances on foreign soil when there is an intent to unlawfully import such substances or chemicals into the United States. In 21 U.S.C.S. § 959, Congress specifically stated that the statute is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. 21 U.S.C.S. § 959(c).

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Delivery, Distribution & Sale > Conspiracy > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > Intent to Distribute > General Overview*
*Governments > Legislation > Effect & Operation > Operability*

Under 21 U.S.C.S. §§ 841 and 846, Congress has not stated its intent to reach discussions held in the United States in furtherance of a conspiracy to possess controlled substances outside the territorial jurisdiction of the United States, with intent to distribute those controlled substances outside of the territorial jurisdiction of the United States.

Opinion

**Opinion by:**        Donald E. Walter

Opinion

{493 F.3d 1306} WALTER, District Judge:

Doris Mangeri Salazar ("Salazar") and Ivan Lopez-Vanegas ("Lopez") appeal their convictions on one count each of conspiracy to possess with the intent to distribute five kilograms or more of a mixture and substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii), and 21 U.S.C. § 846. The Government alleged that Salazar and Lopez brokered a deal between a Colombian drug trafficking organization headed by Juan Gabriel Usuga ("Usuga") and a Saudi Arabian Prince, Nayef Al-Shaalan (the "Prince"), to transport cocaine on the Prince's airplane from Caracas, Venezuela to Paris, France, for distribution in Europe.

{493 F.3d 1307} On appeal, Lopez and Salazar assert, *inter alia*, that the conduct of which they were accused, and for which they have been convicted, does not violate 21 U.S.C. §§ 841 and 846. Finding that Salazar and Lopez have committed {2007 U.S. App. LEXIS 2}no crime against the United States, the judgments of conviction and sentences issued by the district court are **VACATED.**
1

**I. FACTUAL AND PROCEDURAL BACKGROUND**

B05_11CS                                4

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



## A. Course of Proceedings and Disposition Below.

On January 16, 2003, the grand jury returned a second superseding indictment charging the Prince, Jose Clemente ("Clemente"), Lopez and Salazar, in one count (Count 1) with conspiracy to possess with intent to distribute five or more kilograms of cocaine "in Miami-Dade County, in the Southern District of Florida, and elsewhere," in violation of 21 U.S.C. §§ 841 2and 846. (DE:67:1). Clemente was charged in Count 2 with conspiring to launder money. 3 The Prince and Clemente {2007 U.S. App. LEXIS 3}have not been arrested. Appellants Lopez and Salazar were tried together.

A two-month long trial began on March 7, 2005. Immediately after the prosecutor's opening statement, Salazar moved for judgment of acquittal and asserted that the Government's description of the evidence portrayed an agreement to transport cocaine from Venezuela to France, not an agreement to possess or distribute cocaine in the United States. (DE:533:160-61). In response, the Government argued that the "drug conspiracy touches here" because the conspirators held meetings in Miami. (DE:533:161). The district court denied the motion. (DE:533:161). The appellants again moved for judgments of acquittal at the close of the Government's case. 4 (DE:553:97-112). The district court reserved ruling. {2007 U.S. App. LEXIS 4}(DE:553:128). Lopez and Salazar renewed their motions for judgment of acquittal at the close of all evidence, but their motions were denied. (DE:563:34-35,63).

On May 3, 2005, the jury found both Lopez and Salazar guilty of the conspiracy charged in the superseding indictment. (DE:565:3; DE:433-434). Salazar and Lopez timely filed post-trial motions for judgment of acquittal as well as motions for a new trial. (DE:441-45, 450). The Government opposed these motions. (DE:463). The district court denied defendants' motions without an evidentiary hearing. (DE:480).

On August 29, 2005, the district court sentenced Lopez and Salazar to 280 and {493 F.3d 1308} 292 months' imprisonment, respectively. (DE:493; DE:495). Both defendants also received a five-year term of supervised release, a $ 100 special assessment and a fine of $ 25,000. (Id.). The appellants are presently incarcerated.

## B. Statement of the Facts.

### 1. The Usuga Group.

By 1998, Usuga, Carlos Ramon ("Ramon"), Oscar Campuzano ("Campuzano") and Bernard Sanchez ("Sanchez") (collectively, the "Usuga Group") had become partners in a large-scale Colombian cocaine trafficking {2007 U.S. App. LEXIS 5}organization out of Medellin, Colombia. (DE:534:11-12; DE:549:18-19). Usuga was the leader (DE:534:11-12; DE:544:52-54; DE:547:17); Campuzano was in charge of collecting money (DE:548:73-74); Sanchez was responsible for transporting, packaging, warehousing and labeling the cocaine in South America (DE:548:16, 81-82); Ramon handled transportation abroad, including the receipt and delivery of cocaine at its destination. (DE:548:73). Clemente, a Spaniard, was also closely affiliated with the group, though not a member, and specialized in laundering the Usuga Group's drug money. (DE:534:50; DE:541:101-03; DE:544:30-42).

Evidence at trial showed that the Usuga Group exported at least 50 tons of cocaine during the 1990s throughout Europe and North America. The Group also provided transportation services to other traffickers. (DE:539:43-50; DE:544:26-30; DE:549:20-21; DE:551:33-34). The Usuga Group's trademark transportation method was to hide cocaine within isotanks containing petro chemicals. (DE:539:50-51, 115-16; DE:544:28-30; DE:549:20-21).

By January 2000, all four members of the Usuga Group had been indicted in Miami and elsewhere in

B05_11CS

5

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



connection with, among other investigations, Operation {2007 U.S. App. LEXIS 6}Millennium, which targeted high-level narcotics traffickers for extradition. (DE:402:2; DE:544:44-45). All four members of the Usuga Group surrendered, entered into plea agreements and cooperated with the Government. (DE:534:11-12; DE:545:81-95; DE:547:115-24; DE:548:98-129; DE:549:11-17; DE:551:29-31, 57-58; GX58). In particular, Usuga and Campuzano pleaded guilty only to money laundering in connection with Operation Millennium, and each received a reduced sentence of 34 months. (DE:534:19-23; DE:545:85-91). Their sentences were later reduced to 22 and 23 months, respectively. (DE:534:32-34; DE:545:91-95). Both Usuga and Campuzano had served their time before testifying at trial. (DE:534:37; DE: 545:95-96).

Sanchez pleaded guilty to drug trafficking and received a reduced sentence of 156 months, with a Rule 35 motion to reduce his sentence pending. (DE:547:115-24). Ramon pleaded guilty to drug trafficking and received a reduced sentence of six years, with the hope of an additional sentence reduction. (DE:549:9-15).

2. The Charged Conspiracy - "The Paris Load".

Usuga testified at trial that the plans behind the Paris Load began in 1998, when Lopez approached Usuga in Medellin and told {2007 U.S. App. LEXIS 7}him about a "friend of a woman friend of mine" with whom they could engage in financial transactions or deals in Europe. (DE:534:40-42, 75). Usuga later learned that Salazar was Lopez's "woman friend," and that the Prince was Salazar's friend. (DE:534:48). Over the course of a year, the Usuga Group, Clemente, Lopez, the Prince and Salazar had meetings across {493 F.3d 1309} the globe 5 where, according to the Government, the group conspired to purchase cocaine in Colombia, to be shipped from Venezuela to Paris, France, for distribution in Europe. For purposes of this appeal, the Court will assume that all facts alleged by the Government are uncontested. With that in mind, the following meetings took place in Miami, Florida:

a. Miami, Florida ("Porto Fino") -- Mid-September 1998. In mid-September, 1998, Usuga, Ramon and Campuzano met at the "Porto Fino," Ramon's South-Beach condominium. (DE:549:45; DE:545:107). Neither Lopez nor Salazar was present. At this meeting, the group discussed "the way we were going to set up this organization." (DE:549:46). "Various tasks" were assigned after Usuga told his cohorts that "he had been able to confirm that in fact . . . [the Prince] had a bank in Geneva and {2007 U.S. App. LEXIS 8}that [the Prince] was who he said he was." (DE:549:49). Usuga told the group that he would soon be traveling to Saudi Arabia for further discussions. (DE:534:104). Campuzano confirmed Usuga's account of this Miami meeting. (DE:545:102-108).

At this meeting, it was agreed that "there would be two groups . . . [the Prince's] group would consist of [the Prince] and [Salazar] . . . [Salazar would] receive a commission from [the Prince]." (DE:549:50). Lopez would receive his commission from the Usuga Group for each kilogram transported. (Id.). Usuga would handle direct communications with the Prince; Ramon would be responsible for the movement of the cocaine; and Campuzano "would be responsible for setting up the straw corporations abroad." (Id.).

Usuga presented two proposals: one possibility involved the shipment of ten or twenty tons of cocaine using isotanks from Venezuela to Saudi Arabia for re-export to New York 6; the second proposal was to {2007 U.S. App. LEXIS 9}transport cocaine in the Prince's airplane {493 F.3d 1310} from Venezuela to Saudi Arabia. (DE:549:51-60).

b. Miami,Florida(Dinner at The Forge Restaurant)-- November/December 1998. In November or December of 1998, Ramon, Salazar, Clemente, Lopez, Usuga and Pepe Gugliatto met for dinner at The Forge. (DE:549:69-70). There, Lopez and Salazar introduced Gugliatto to Usuga. (DE:534:114, 118). Salazar assured Usuga that Gugliatto was a close friend akin to a relative "with whom [Usuga]

B05_11CS

6

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

could comfortably talk." (DE:534:119). According to Ramon, Gugliatto was Lopez's personal friend and came with good references from Lopez and Salazar (DE:551:67). Two matters were discussed at this Miami meeting: the Brazil shoe deal, 7 and Gugliatto's potential for "partnership" with the Prince. (DE:549:73-75). Salazar sat with the group at the Forge; "she gave her opinions" though Ramon could not recall her exact words. (DE:549:76).

Ramon testified that another meeting occurred at the Biltmore Hotel in Miami, involving Usuga, Ramon, Clemente, Salazar and Gugliatto. (DE:549:77-79). At that meeting, "some comments were made" about the potential Prince deal, but nothing specific. (Id.). Usuga, however, testified that they did not discuss the meal at this meeting. (DE:534:114, 126-27).

c. Miami, Florida (Don Shula Hotel) -- March 5, 1999. On March 5, 1999, Usuga met Salazar, Lopez and Gugliatto at the Don Shula Hotel in Miami. (DE:537:5-7). The brief discussion at this meeting centered on the upcoming arrival of the Prince in Caracas, Venezuela for which "everything was ready." (DE:537:8). {2007 U.S. App. LEXIS 13}Lopez stated that he would notify Usuga of the Prince's arrival date, a few days prior to that date. Usuga replied "that we would be waiting for that." (DE:537:8).

d. Miami, Florida (Tides Hotel) -- July 1999. After the Paris Load was successfully purchased in Colombia, transported to Caracas, Venezuela, and shipped to Paris, France on May 16, 1999, most of the load was distributed, but 804 kilograms of cocaine were seized by French law enforcement on June 3, 1999. (DE:542:50-54, 62). In July 1999, Usuga, Campuzano, Clemente and Salazar met at the Tides Hotel in Miami Beach to discuss the amount of money owed to the Prince, who had already been paid $ 5,000,000 from Lopez's sale of 250 kilograms of cocaine. (DE:546:16). According to Usuga and {493 F.3d 1311} Campuzano, Salazar demanded payment of her commission "for the Paris operation" and an additional $ 10,000,000 owed the Prince, but Usuga refused. (DE:537:120-21; DE:546:16-17). Salazar insisted "that the money was owed to the Prince and it had to be paid." (DE:546:17). Salazar further insisted that Usuga was "responsible for the incident" and, thus, was responsible for her commission. (DE:537:121).

e. Recorded Conversations With Lopez. After Usuga {2007 U.S. App. LEXIS 14}was arrested and was cooperating with the Government, he recorded a number of conversations with Lopez between April 2000 and March 2001. (DE:538:25-26; GX12 - GX21). After Campuzano surrendered and agreed to cooperate with the Government, Lopez called and Campuzano also recorded their conversation. (DE:546:20-21). Lopez's conversations with Campuzano and Usuga centered on the debts owed to the Prince, and those owed by and to 8 Lopez as a result of the Paris Load. (DE:538:61, 65; DE:539:15, 24-25, 27; DE:546:20, 42-45, 50, 53).

## II. DISCUSSION

Whether a criminal statute reaches a defendant's conduct is reviewed de novo. United States v. Calhoon, 97 F.3d 518, 523-24 (11th Cir. 1996).

Appellants assert that the agreement to ship cocaine from Colombia to Venezuela to Saudi Arabia to France for distribution throughout Europe does not violate 21 U.S.C. § 846 because the object of the conspiracy -- the possession and distribution of cocaine on foreign soil -- is not a violation of 21 U.S.C. § 841(a)(1). Thus, the district court should have granted defendants' motion for acquittal {2007 U.S. App. LEXIS 15}at the close of the Government's case. The Government asserts that the defendants' conduct 9 was encompassed by the prohibitions of 21 U.S.C. § 846 and § 841(a)(1), forbidding conspiracy to possess with intent to distribute cocaine. The issue of whether discussions occurring in the United States related to possession of controlled substances outside of the United States with intent to distribute those substances outside of the United States is a crime in the United

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



States is <u>res nova</u> in the Eleventh Circuit. We squarely address that issue now.

Title 21 U.S.C. § 841(a)(1), in conjunction with § 846, makes it unlawful for any person to conspire to possess with the intent to distribute a controlled substance, such as cocaine. Neither statute expressly requires that possession, distribution nor an act in furtherance of the conspiracy occur in the United States. A silent statute is presumed to apply only domestically. <u>Small v. United States</u>, 544 U.S. 385, 388, 125 S. Ct. 1752, 1755, 161 L. Ed. 2d 651 (2005). {2007 U.S. App. LEXIS 16}Such statutes may be given extraterritorial application if the nature of the law permits it **and** Congress intends it. <u>United States v. Baker</u>, 609 F.2d 134, 136 (5th Cir. 1980). "Absent an express intention on the face of the statutes to do so, the exercise of that power may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate {493 F.3d 1312} the type of crime involved." <u>Id.</u>, at 136. The United States Supreme Court explained the issues involved with a statute silent as to its extraterritorial application:

> The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed out side {2007 U.S. App. LEXIS 17}{sic} of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.<u>United States v. Bowman</u>, 260 U.S. 94, 97-98, 43 S. Ct. 39, 41, 67 L. Ed. 149 (1922). {2007 U.S. App. LEXIS 18}

Our case law, and that of our sister circuits, has applied § 841(a)(1) and § 846 extraterritorially in certain circumstances, even though Congress has not specifically expressed its intent on the matter. See <u>United States v. Baker</u>, 609 F.2d 134, 139 (5th Cir. 1980); see also <u>United States v. Gomez-Tostado</u>, 597 F.2d 170 (9th Cir. 1979); <u>United States v. Hayes</u>, 653 F.2d 8, 15 (1st Cir. 1981); <u>United States v. Muench</u>, 694 F.2d 28 (2d Cir. 1982); <u>United States v. Montoya</u>, 782 F.2d 1554, 1555 (11th Cir. 1986); <u>United States v. MacAllister</u>, 160 F.3d 1304, 1308 (11th Cir. 1998); <u>United States v.Holler</u>, 411 F.3d 1061, 1064-65 (9th Cir. 2005). However, in each of those cases some other nexus to the United States allowed for extraterritorial application of § 841(a)(1): defendants either possessed or conspired to possess controlled substances within the United States, or intended to distribute controlled substances within the United States. Our predecessor Court made clear in <u>Baker</u> that § 841(a)(1) does not apply to possession outside United States territory unless the possessor intends to distribute the contraband within the United States. <u>Baker</u>, 609 F.2d at 139; see <u>Muench</u>, 694 F.2d at 33 (discussing {2007 U.S. App. LEXIS 19}<u>Baker</u> and <u>Hayes</u>). Furthermore, there can be no violation of § 846 if the object of the conspiracy is not a violation of the substantive

B05_11CS                                          8


© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

offense. 21 U.S.C. § 846 ("Any person who . . . conspires to commit any offense defined in {493 F.3d 1313} this subchapter . . . ."). Accordingly, where, as here, the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States, there is no violation of § 841(a)(1) or § 846.

Further, Congress has shown it is capable of addressing acts involving controlled substances occurring outside of the United States, and has shown it thinks it necessary to make specific provisions in the law that allow the locus to include acts of manufacture or distribution of controlled substances on foreign soil when there is an intent to unlawfully import such substances or chemicals into the United States. See e.g., 21 U.S.C. § 959. In 21 U.S.C. § 959, Congress specifically stated that the statute "is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 959©. Under 21 U.S.C. §§ 841 and 846, Congress has not stated its intent to {2007 U.S. App. LEXIS 20}reach discussions held in the United States in furtherance of a conspiracy to *possess* controlled substances *outside* the territorial jurisdiction of the United States, with intent to *distribute* those controlled substances *outside* of the territorial jurisdiction of the United States.

Because the Court holds that 21 U.S.C. §§ 841 and 846 do not apply extraterritorially, the conduct of Lopez and Salazar does not violate those statutes. The judgments of conviction and sentences issued by the district court are **VACATED**. Accordingly, this Court need not address the other issues raised on appeal.

## Footnotes

\*
1

Lopez and Salazar also argue on appeal (1) that the Government committed a Brady violation by concealing post-cooperation drug trafficking by Usuga; (2) that the district court erred in permitting the Government to cross-examine Salazar with regard to the Prince's alleged prior indictment; and (3) that the district court erred in excluding cross-examination of the Government's witnesses and extrinsic evidence regarding a scheme to obstruct justice. Because we vacate the conviction in this case, these issues are moot.
2

Title 21 U.S.C. § 841 provides, and provided at the time of the charged conspiracy, in pertinent part, that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. . . ."
3

The original indictment, returned on June 27, 2002, charged Clemente alone with conspiring to launder money. (DE:1).
4

Lopez and Salazar joined in each other's objections and motions. (DE:534:18).
5

Meetings were held in Marbella, Spain, Geneva, Switzerland, Saudi Arabia, Aruba, Colombia and Miami. The Court will focus on the Miami meetings as they are the only events related to the charged conspiracy that took place in the United States.
6

B05_11CS                                    9

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



There is no dispute that Usuga, not the Prince, wanted to send the shipment to New York. (DE:535:72-77). Further, the Government has not asserted that shipment to New York was anything more than a one-sided fleeting thought.

In its appellate brief, the Government relies solely upon the "domestic conspiratorial conduct" of Lopez and Salazar to support its argument that the district court had jurisdiction, or as is discussed below, that a crime was actually committed under 21 U.S.C. §§ 841(a)(1) and 846. Brief for the United States, pp. 28-29. Further, the Government's subsequent arguments presume that there was no agreement to distribute illegal narcotics in the United States, e.g., "[t]he law does not impose upon §§ 846 and 841(a)(1) any requirement that the object of such a conspiracy must be to possess or distribute cocaine in the United States"; "[b]ecause a defendant may be convicted of a substantive offense under § 841(a)(1) without intending to distribute narcotics in the United States, it follows that defendants like Salazar and Lopez may be guilty of conspiracy to possess with intent {2007 U.S. App. LEXIS 10}to distribute cocaine, in violation of § 846, as long as they or others have engaged in conspiratorial activities to violate that statute in the United States." Brief for the United States, pp. 29-30. Further, as noted above, in response to Salazar's motion for judgment of acquittal, the Government argued that "the drug conspiracy touches here" **because the conspirators held meetings in Miami.** (DE:533:161).

In other words, the Government does not rely upon Usuga's statement that he initially wanted to ship cocaine to New York rather than Paris. Thus, this Court finds that the Government has abandoned any such argument. See Sepulveda v. United States Attorney General, 401 F.3d 1226, 1228 n. 2 (11th Cir. 2002) (concluding that the petitioners abandoned an issue by failing to raise it in their initial appellate brief); see also United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (failure to offer argument on issue on appeal results in abandonment of that issue); Johnson v. Wainwright, 806 F.2d 1479, 1481 n. 2 (11th Cir. 1986) (State did not raise defense of failure to exhaust state remedies on appeal, and thus waived any right to claim such a defense); Adler v. Duval County School Board, 112 F.3d 1475, 1481 n. 12 (11th Cir. 1997) {2007 U.S. App. LEXIS 11}("[I]t is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate.").
7

Gugliatto proposed sending cocaine from Brazil to the Port of Miami; the cocaine would be hidden in a commercial cargo container of shoes where Gugliatto could access {2007 U.S. App. LEXIS 12}them "before Customs could touch them." (DE:549:73, 77). Lopez contributed $ 350,000 to be part of the Brazil shoe deal, which would have involved "a ton of units," but that deal never materialized. (DE:548:93; DE:534:131-32). The Government conceded, and the district court acknowledged and *instructed the jury*, that the Brazil shoe deal was a separate *uncharged* conspiracy that was offered simply to explain the relationship among the participants. (DE:560:152-55); see also (DE:463:9-10; DE:534:106-13; DE:546:28-33 DE:549:71-73; DE:567:44).
8

In speaking with both Campuzano and Usuga, Lopez sought a refund from Campuzano on the aborted Brazil shoe deal.
9

The Government only addresses this issue with regard to Salazar. However, Lopez adopted Salazar's Brief related to the issue of whether the conduct of Lopez and Salazar violated §§ 841 and 846. Therefore, the Court makes its determination as to both appellants.

B05_11CS                                          **10**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT B

UNITED STATES OF AMERICA / MEXICO BORDER

MAP

Case 1:08-cr-00140-WFK   Document 59   Filed 11/05/19   Page 35 of 55 PageID #: 344



**(A)** Around 300 miles from Tampico to the nearest U.S. Border at Matamoros.

**(B)** Around 500 miles from Veracruz to the nearest U.S. Border at Matamoros.

EXHIBIT C

PSR/PSI

THE OFFENSE CONDUCT

**PART A. THE OFFENSE**

**Charge and Conviction**

1.  On December 12, 2008, the defendant pled guilty before Your Honor to Count One of a single-count indictment. The indictment charges that between January 1, 1990 and February 29, 2008, the defendant, together with others, conspired to distribute cocaine, intending and knowing that such substances would be imported into the United States, in violation of 21 U.S.C. § 960(a)(3) and 21 U.S.C. § 960(b)(1)(B).

2.  As outlined in the *Sentencing Options* section of this report, the defendant is subject to forfeiture.

**The Offense Conduct**

3.  By way of background, in 1996, the defendant started as an enforcer and debt collector for other narcotics traffickers in Medellin, Colombia. By approximately 2006, the defendant was a large cocaine trafficker on his own right. He invested in and assembled multi-thousand kilogram loads of cocaine, which he then transported for further transport and distribution. Additionally, between January 1, 1999 and February 29, 2008, the defendant exercised control over Colombia's two Atlantic Ports, Port of Cartagena and Port of Barranquilla. The defendant exacted a fee for every kilogram of cocaine that was shipped through these ports.

4.  The defendant was the source of supply of cocaine for Los Zetas, who are a powerful and violent criminal syndicate in Mexico. He is responsible for five separate shipments of cocaine from Colombia to Mexico. The shipments of cocaine left Cartagena, Colombia, on large freighters and were off loaded in the port city of Vera Cruz, Mexico. The Los Zetas were responsible for receiving these shipments which they then smuggled into the United States. The five shipments were successfully smuggled into the United States, and they totaled 33,782 kilograms of cocaine. The defendant had personal ownership of 15,238 kilograms of cocaine. The additional co-conspirators, including Los Zetas and others, owned the remaining amount of cocaine.

5.  In 2007, the defendant was the source of supply of 11,700 kilograms of cocaine that were received by Los Zetas in Mexico. This shipment was seized by law enforcement authorities in Tampico, Mexico. Los Zetas had paid the defendant $28,000,000 for the cocaine. The money had been transported from the United States to Mexico via a tractor trailer, and the money was delivered to the defendant in Mexico City, Mexico.

6.  On March 5, 2008, an arrest warrant was issued for the defendant, and he surrendered to law enforcement on December 4, 2008. The defendant also pled guilty to the instant offense on that day, and he was released on that day on a personal recognizance bond. The defendant subsequently fled the jurisdiction, and an arrest warrant was issued by Your Honor on June 29, 2009. The defendant was rearrested on an international warrant in Venezuela on November 27, 2011, and he was extradited to the United States on December 14, 2011. He made no post-arrest statements. The defendant is accountable for at least 45,482 kilograms (33,782 kilograms + 11,700 kilograms) of cocaine.

Although requested, to date, the Government has not provided the exact drug weight for the defendant; however, as the defendant controlled the two main ports in Colombia, he was involved in a much greater quantity of cocaine distribution.  As noted above, the defendant was the source of cocaine supply for Los Zetas, a powerful and violent criminal syndicate in Mexico.  The members of this organization exceed five.  Therefore, the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, 4 levels are added. USSG §3B1.1(a).

EXHIBIT D

THE UNITED STATES SUPREME COURT'S OPINION

REGARDING "KNOWLEDGE" OF VIOLATING A UNITED STATES CODE SERVICE

[cf. 18 U.S.C. §922(g) AND §924(a)(2)]

BY JUSTICE BREYER

Justice Breyer delivered the opinion of the Court.

A federal statute, 18 U. S. C. §922(g), provides that ``[i]t shall be unlawful'' for certain individuals to possess firearms. The provision lists nine categories of individuals subject to the prohibition, including felons and aliens who are ``illegally{2019 U.S. LEXIS 5} or unlawfully in the United States.'' *Ibid*. A separate provision, §924(a)(2), adds that anyone who ``*knowingly* violates'' the first provision shall be fined or imprisoned for up to 10 years. (Emphasis added.)

The question here concerns the scope of the word ``knowingly.'' Does it mean that the Government must prove that a defendant knew both that he engaged in the relevant conduct (that he possessed a firearm) and also that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)? We hold that the word ``knowingly'' applies both to the defendant's conduct and to the defendant's status. To convict a defendant, the Government therefore must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it.

I

Petitioner Hamid **Rehaif** entered the United States on a nonimmigrant student visa to attend university. After he received poor grades, the university dismissed him and told him that his ``'immigration status''' would be terminated unless he transferred to a different university or left the country. App. to Pet. for Cert. 3a. **Rehaif** did neither.

**Rehaif** subsequently visited a firing range, where he shot{2019 U.S. LEXIS 6} two firearms. The Government learned about his target practice and prosecuted him for possessing firearms as an alien unlawfully in the United States, in violation of §922(g) and §924(a)(2). At the close of Rehaif's trial, the judge instructed the jury (over Rehaif's objection) that the ``United States is not required to prove'' that **Rehaif** ``knew that he was illegally or unlawfully in the United States.'' App. to Pet. for Cert. 4a (internal quotation marks omitted). The jury returned a guilty verdict, and **Rehaif** was sentenced to 18 months' imprisonment.

{139 S. Ct. 2195} **Rehaif** appealed. He argued that the judge erred in instructing the jury that it did not need to find that he knew he was in the country unlawfully. The Court of Appeals for the Eleventh Circuit, however, concluded that the jury instruction was correct, and it affirmed Rehaif's conviction. See 888 F. 3d 1138, 1148 (2018). The Court of Appeals believed that the criminal law generally does not require a defendant to know his own status, and further observed that no court of appeals had required the Government to establish a defendant's knowledge of his status in the {204 L. Ed. 2d 600} analogous context of felon-in-possession prosecutions. *Id.*, at 1145-1146.

We granted certiorari to consider whether, in prosecutions under{2019 U.S. LEXIS 7} §922(g) and §924(a)(2), the Government must prove that a defendant knows of his status as a person barred from possessing a firearm. We now reverse.

II

Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent. See *Staples* v. *United States*, 511 U. S. 600, 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). In determining Congress' intent, we start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding ``each of the statutory elements that criminalize otherwise innocent conduct.'' *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 72, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994); see also *Morissette* v. *United States*, 342 U. S. 246, 256-258, 72 S. Ct. 240, 96 L. Ed. 288 (1952). We normally characterize this interpretive maxim as a presumption in favor of ``scienter,'' by which

SCTHOT                                                    1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

we mean a presumption that criminal statutes require the degree of knowledge sufficient to ``mak[e] a person legally responsible for the consequences of his or her act or omission.'' Black's Law Dictionary 1547 (10th ed. 2014).

We apply the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text. See *Staples*, 511 U. S., at 606, 114 S. Ct. 1793, 128 L. Ed. 2d 608. But the presumption applies with equal or greater force when Congress includes a general scienter provision in the statute itself. See ALI, Model Penal Code §2.02(4), p. 22 (1985) (when a statute ``prescribes the kind of culpability{2019 U.S. LEXIS 8} that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears'').

A

Here we can find no convincing reason to depart from the ordinary presumption in favor of scienter. The statutory text supports the presumption. The text of §924(a)(2) says that ``[w]hoever knowingly violates'' certain subsections of §922, including §922(g), ``shall be'' subject to penalties of up to 10 years' imprisonment. The text of §922(g) in turn provides that it ``shall be unlawful for any person . . . ., being an alien . . . illegally or unlawfully in the United States,'' to ``possess in or affecting commerce, any firearm or ammunition.''

The term ``knowingly'' in §924(a)(2) modifies the verb ``violates'' and its direct object, which in this case is §922(g). The proper interpretation of the statute thus turns on what it means for a defendant to know that he has ``violate[d]'' §922(g). With some here-irrelevant omissions, §922(g) makes possession of a firearm or ammunition unlawful when the following elements are satisfied: (1) a status element (in this case, ``being an alien . . . illegally {139 S. Ct. 2196} or unlawfully in the United States''); (2) a{2019 U.S. LEXIS 9} possession element (to ``possess''); (3) a jurisdictional element (``in or affecting commerce''); and (4) a firearm element (a ``firearm or ammunition'').

{204 L. Ed. 2d 601} No one here claims that the word ``knowingly'' modifies the statute's jurisdictional element. Jurisdictional elements do not describe the ``evil Congress seeks to prevent,'' but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct (normally, as here, through its Commerce Clause power). *Luna Torres* v. *Lynch*, 578 U. S. ___, ___-___, 136 S. Ct. 1619, 194 L. Ed. 2d 737, 758 (2016). Because jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct, such elements are not subject to the presumption in favor of scienter. See *id.*, at ___, 136 S. Ct. 1619, 194 L. Ed. 2d 737 (slip op., at 16).

Jurisdictional element aside, however, the text of §922(g) simply lists the elements that make a defendant's behavior criminal. As ``a matter of ordinary English grammar,'' we normally read the statutory term ``'knowingly' as applying to all the subsequently listed elements of the crime.'' *Flores-Figueroa* v. *United States*, 556 U. S. 646, 650, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009); see also *id.*, at 652, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (we ``ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element''). This is notably not a case where the modifier ``knowingly'' introduces{2019 U.S. LEXIS 10} a long statutory phrase, such that questions may reasonably arise about how far into the statute the modifier extends. See *id.*, at 659, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (Alito, J., concurring in part). And everyone agrees that the word ``knowingly'' applies to §922(g)'s possession element, which is situated after the status element. We see no basis to interpret ``knowingly'' as applying to the second §922(g) element but not the first. See *United States* v. *Games-Perez*, 667 F. 3d 1136, 1143 (CA10 2012) (Gorsuch, J., concurring). To the contrary, we think that by specifying that a defendant may be convicted only if he ``knowingly violates'' §922(g), Congress intended to require

SCTHOT                                          2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the Government to establish that the defendant knew he violated the material elements of §922(g).

B

Beyond the text, our reading of §922(g) and §924(a)(2) is consistent with a basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called ``a vicious will.'' 4 W. Blackstone, Commentaries on the Laws of England 21 (1769). As this Court has explained, the understanding that an injury is criminal only if inflicted knowingly ``is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.'' *Morissette*, 342 U. S., at 250, 72 S. Ct. 240, 96 L. Ed. 288. Scienter requirements{2019 U.S. LEXIS 11} advance this basic principle of criminal law by helping to ``separate those who understand the wrongful nature of their act from those who do not.'' *X-Citement Video*, 513 U. S., at 72-73, n. 3, 115 S. Ct. 464, 130 L. Ed. 372.

The cases in which we have emphasized scienter's importance in separating wrongful from innocent acts are legion. See, *e.g.*, *id.*, at 70, 115 S. Ct. 464, 130 L. Ed. 372; *Staples*, 511 U. S., at 610; *Liparota* v. *United States*, 471 U. S. 419, 425, 105 S. Ct. {204 L. Ed. 2d 602} 2084, 85 L. Ed. 2d 434 (1985); *United States* v. *Bailey*, 444 U. S. 394, 406, n. 6, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980); *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 436, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *Morissette*, 342 U. S., at 250-251, 72 {139 S. Ct. 2197} S. Ct. 240, 96 L. Ed. 288. We have interpreted statutes to include a scienter requirement even where the statutory text is silent on the question. See *Staples*, 511 U. S., at 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608. And we have interpreted statutes to include a scienter requirement even where ``the most grammatical reading of the statute'' does not support one. *X-Citement Video*, 513 U. S., at 70, 115 S. Ct. 464, 130 L. Ed. 372.

Applying the word ``knowingly'' to the defendant's status in §922(g) helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts. Assuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent. See *Staples*, 511 U. S., at 611, 114 S. Ct. 1793, 128 L. Ed. 2d 608. It is therefore the defendant's *status*, and not his conduct alone, that makes the difference. Without knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful. His behavior may instead be an innocent mistake to which criminal sanctions normally do not attach. Cf. O. Holmes, The Common Law 3 (1881) (``even a dog distinguishes between{2019 U.S. LEXIS 12} being stumbled over and being kicked'').

We have sometimes declined to read a scienter requirement into criminal statutes. See *United States* v. *Balint*, 258 U. S. 250, 254, 42 S. Ct. 301, 66 L. Ed. 604, T.D. 3375 (1922). But we have typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a ``regulatory'' or ``public welfare'' program and carry only minor penalties. See *Staples*, 511 U. S., at 606, 114 S. Ct. 1793, 128 L. Ed. 2d 608; *Morissette*, 342 U. S., at 255-259, 72 S. Ct. 240, 96 L. Ed. 288. The firearms provisions before us are not part of a regulatory or public welfare program, and they carry a potential penalty of 10 years in prison that we have previously described as ``harsh.'' *X-Citement Video*, 513 U. S., at 72, 115 S. Ct. 464, 130 L. Ed. 372. Hence, this exception to the presumption in favor of scienter does not apply.

III

The Government's arguments to the contrary do not convince us that Congress sought to depart from the normal presumption in favor of scienter.

The Government argues that Congress does not normally require defendants to know their own status. But the Government supports this claim primarily by referring to statutes that differ significantly from the provisions at issue here. One of these statutes prohibits ``an officer, employee,

SCTHOT                                            3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

77018058

contractor, or consultant of the United States" from misappropriating classified information. 18 U. S. C. §1924(a). Another statute applies to anyone ``at least eighteen{2019 U.S. LEXIS 13} years of age" who solicits a minor to help avoid detection for certain federal crimes. 21 U. S. C. §861(a)(2). A third applies to a ``parent [or] legal guardian" who allows his child to be used for child pornography. 18 U. S. C. §2251(b).

We need not decide whether we agree or disagree with the Government's interpretation of these statutes{204 L. Ed. 2d 603} . In the provisions at issue here, the defendant's status is the ``crucial element" separating innocent from wrongful conduct. X-Citement Video, 513 U. S., at 73, 115 S. Ct. 464, 130 L. Ed. 372. But in the statutes cited by the Government, the conduct prohibited-misappropriating classified information, seeking to evade detection for certain federal crimes, and facilitating child pornography-would be wrongful irrespective of the defendant's status. This difference assures us that the presumption in favor of scienter applies here even assuming the Government is right that these other statutes do not require knowledge of status.

Nor do we believe that Congress would have expected defendants under §922(g) and §924(a)(2) to know their own statuses. If the provisions before us were construed to require no knowledge of status, {139 S. Ct. 2198} they might well apply to an alien who was brought into the United States unlawfully as a small child and was therefore unaware of his unlawful status. Or these{2019 U.S. LEXIS 14} provisions might apply to a person who was convicted of a prior crime but sentenced only to probation, who does not know that the crime is ``punishable by imprisonment for a term exceeding one year." §922(g)(1) (emphasis added); see also Games-Perez, 667 F. 3d, at 1138 (defendant held strictly liable regarding his status as a felon even though the trial judge had told him repeatedly-but incorrectly-that he would ``leave this courtroom not convicted of a felony"). As we have said, we normally presume that Congress did not intend to impose criminal liability on persons who, due to lack of knowledge, did not have a wrongful mental state. And we doubt that the obligation to prove a defendant's knowledge of his status will be as burdensome as the Government suggests. See Staples, 511 U. S., at 615, n. 11, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (``knowledge can be inferred from circumstantial evidence").

The Government also argues that whether an alien is ``illegally or unlawfully in the United States" is a question of law, not fact, and thus appeals to the well-known maxim that ``ignorance of the law" (or a ``mistake of law") is no excuse. Cheek v. United States, 498 U. S. 192, 199, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).

This maxim, however, normally applies where a defendant has the requisite mental state in respect to the elements of the crime but claims to be ``unaware of the existence{2019 U.S. LEXIS 15} of a statute proscribing his conduct." 1 W. LaFave & A. Scott, Substantive Criminal Law §5.1(a), p. 575 (1986). In contrast, the maxim does not normally apply where a defendant ``has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct," thereby negating an element of the offense. Ibid.; see also Model Penal Code §2.04, at 27 (a mistake of law is a defense if the mistake negates the ``knowledge . . . required to establish a material element of the offense"). Much of the confusion surrounding the ignorance-of-the-law maxim stems from ``the failure to distinguish [these] two quite different situations." LaFave, Substantive Criminal Law §5.1(d), at 585.

We applied this distinction in Liparota, where we considered a statute that imposed criminal liability on ``whoever knowingly uses, transfers, {204 L. Ed. 2d 604} acquires, alters, or possesses" food stamps ``in any manner not authorized by the statute or the regulations." 471 U. S., at 420, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (quotation altered). We held that the statute required scienter not only in respect to the defendant's use of food stamps, but also in respect to whether the food stamps were

SCTHOT                                                4

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

used in a ``manner not authorized{2019 U.S. LEXIS 16} by the statute or regulations.'' *Id.*, at 425, n. 9, 105 S. Ct. 2084, 85 L. Ed. 2d 434. We therefore required the Government to prove that the defendant knew that his use of food stamps was unlawful-even though that was a question of law. See *ibid*.

This case is similar. The defendant's status as an alien ``illegally or unlawfully in the United States'' refers to a legal matter, but this legal matter is what the commentators refer to as a ``collateral'' question of law. A defendant who does not know that he is an alien ``illegally or unlawfully in the United States'' does not have the guilty state of mind that the statute's language and purposes require.

The Government finally turns for support to the statutory and legislative history. Congress first enacted a criminal statute prohibiting particular categories of persons from possessing firearms in 1938. See Federal Firearms Act, 52 Stat. 1250. {139 S. Ct. 2199} In 1968, Congress added new categories of persons subject to the prohibition. See Omnibus Crime Control and Safe Streets Act, 82 Stat. 197. Then, in 1986, Congress passed the statute at issue here, the Firearms Owners' Protection Act, 100 Stat. 449, note following 18 U. S. C. §921, which reorganized the prohibition on firearm possession and added the language providing that only those who violate the prohibition{2019 U.S. LEXIS 17} ``knowingly'' may be held criminally liable.

The Government says that, prior to 1986, the courts had reached a consensus that the law did not require the Government to prove scienter regarding a defendant's status. And the Government relies on the interpretive canon providing that when particular statutory language has received a settled judicial construction, and Congress subsequently reenacts that ``same language,'' courts should presume that Congress intended to ratify the judicial consensus. *Helsinn Healthcare S. A. v. Teva Pharmaceuticals USA, Inc.*, 586 U. S. ___, ___, 139 S. Ct. 628, 202 L. Ed. 2d 551, 559 (2019).

Prior to 1986, however, there was no definitive judicial consensus that knowledge of status was not needed. This Court had not considered the matter. As the Government says, most lower courts had concluded that the statute did not require knowledge of status. See, *e.g.*, *United States* v. *Pruner*, 606 F. 2d 871, 874 (CA9 1979). But the Sixth Circuit had held to the contrary, specifically citing the risk that a defendant ``may not be aware of the fact'' that barred him from possessing a firearm. *United States* v. *Renner*, 496 F. 2d 922, 926 (1974). And the Fourth Circuit had found that knowledge of a defendant's status was not needed because the statute ``[b]y its terms'' did not require knowledge of status. *United States* v. *Williams*, 588 F. 2d 92 (1978) (*per curiam*).

This last-mentioned circumstance is important. Any pre-1986 consensus involved the statute{2019 U.S. LEXIS 18} as it read prior to 1986-without any explicit scienter provision. But Congress in 1986 added a provision clarifying that a {204 L. Ed. 2d 605} defendant could be convicted only if he violated the prohibition on firearm possession ``knowingly.'' This addition, which would serve no apparent purpose under the Government's view, makes it all but impossible to draw any inference that Congress intended to ratify a pre-existing consensus when, in 1986, it amended the statute.

The Government points to the House Report on the legislation, which says that the 1986 statute would require the Government to prove ``that the defendant's *conduct* was knowing.'' H. R. Rep. No. 99-495, p. 10 (1986) (emphasis added). Although this statement speaks of ``conduct'' rather than ``status,'' context suggests that the Report may have meant the former to include the latter. In any event, other statements suggest that the word ``knowingly'' was intended to apply to both conduct and status. The Senate Report, for example, says that the proposed amendments sought to exclude ``individuals who lack all criminal intent and knowledge,'' without distinguishing between conduct and status. S. Rep. No. 97-476, p. 15 (1982). And one Senate sponsor of the{2019 U.S. LEXIS 19} bill pointed out that the absence of a scienter requirement in the prior statutes had resulted in ``severe

SCTHOT                                          5

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

penalties for unintentional missteps." 132 Cong. Rec. 9590 (1986) (statement of Sen. Hatch).

Thus, assuming without deciding that statutory or legislative history could overcome the longstanding presumption in favor of scienter, that history here is at best inconclusive.

***

{139 S. Ct. 2200} The Government asks us to hold that any error in the jury instructions in this case was harmless. But the lower courts did not address that question. We therefore leave the question for those courts to decide on remand. See *Thacker* v. *TVA*, 587 U. S. ___, ___, 139 S. Ct. 1435, 203 L. Ed. 2d 668, 678 (2019)) (citing *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)).

We conclude that in a prosecution under 18 U. S. C. §922(g) and §924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm. We express no view, however, about what precisely the Government must prove to establish a defendant's knowledge of status in respect to other §922(g) provisions not at issue here. See *post*, at 13-15 (Alito, J., dissenting) (discussing other statuses listed in §922(g) not at issue here). We accordingly reverse the judgment of the Court of Appeals and remand the case for further{2019 U.S. LEXIS 20} proceedings consistent with this opinion.

*It is so ordered.*

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

77013051

EXHIBIT E

§3553(a) FACTORS IN SUPPORT FOR THE RELIEF MOVANT SEEKS

- SUMMARY REENTRY PLAN - PROGRESS REPORT

- INMATE DISCIPLINE DATA CHRONOLOGICAL DISCIPLINARY RECORD



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: BONILLA, MAXIMILIANO   77018-053

SEQUENCE: 00138046
Report Date: 10-17-2019



| | | | |
|---|---|---|---|
| Facility: | EST ESTILL FCI | Custody Level: | IN |
| Name: | BONILLA, MAXIMILIANO | Security Level: | MEDIUM |
| Register No.: | 77018-053 | Proj. Rel Date: | 04-28-2029 |
| Quarters: | C02-212L | Release Method: | GCT REL |
| Age: | 47 | DNA Status: | MIM07250 / 12-15-2011 |
| Date of Birth: | 09-24-1972 | | |

### Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 21:960(A)(3) CONSPIRACY TO DISTRIBUTE COCAINE | 20 YEARS |

Date Sentence Computation Began:   10-19-2016
Sentencing District:   NEW YORK, EASTERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /   0 /   0 | 378 | Years: 7 Months: 10 Days: | + 1789   JC - 0   InOp |
| | | Time Served | |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| POSS DEPORT COLOMBIAA | null |

### Pending Charges

| |
|---|
| BICE detainer for deportation |

### Program Plans

Maximiliano Bonilla arrived at FCI Estill, South Carolina, on January 10, 2017.  His interaction with staff and other inmates is viewed as positive.  He is not viewed as a management concern.  He has requested a Progress Report be prepared for Judge Sandra L. Townes.

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| EST | ORD CA | ORDERLY CA 7:30 AM - 3:00 PM | 09-27-2019 |

### Work Assignment Summary

Maximiliano Bonilla is currently assigned to the unit as an orderly.  Maximiliano Bonilla continues to receive good work reports from his detail supervisor.  He has been valuable on the work detail and the unit continues to maintain outstanding unit sanitation.  He continues to assist with any additional work assignment that need to be completed in the unit.

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| EST | ESL EXEMPT | ESL NEED-PERMANENTLY EXEMPT | 02-09-2017 |
| EST | GED EP | ENROLL GED PROMOTE W/CAUSE | 09-17-2018 |
| EST | GED SAT | GED PROGRESS SATISFACTORY | 12-07-2017 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| EST | | SPGED M-F 7:30-9:00(PG#6) | 01-16-2018 | CURRENT |
| EST | C | PARENTING RESOURCE SEMINAR | 11-07-2018 | 11-07-2018 |
| EST | C | STOCK MARKET ANALYSIS (EM #2) | 04-25-2018 | 07-17-2018 |
| EST | W | ESL LAWHON 2-3:30 PM M-F(PG#6) | 02-27-2017 | 01-29-2018 |
| EST | C | INSIDE OUT DAD (#6) | 10-17-2017 | 01-25-2018 |
| EST | W | FCI PAINTING M/W 12-2PM SAT/SU | 06-17-2017 | 09-17-2017 |
| EST | C | FCI LEATHER T/TH 8-10 AM PG#6 | 02-01-2017 | 04-25-2017 |
| EST | C | INFECTIOUS DISEASE PREVT(HN#1) | 02-02-2017 | 02-02-2017 |

### Education Information Summary

Maximiliano Bonilla has continued to program in a positive manner.  He has completed numerous educational and vocational training classes requested by his Unit Team.  See attached document also.



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: BONILLA, MAXIMILIANO 77018-053

SEQUENCE: 00138046
Report Date: 10-17-2019

## Discipline Reports

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

## Discipline Summary

Maximiliano Bonilla has not incurred any incident reports since the start of his federal sentence. He is not viewed as a management concern.

## ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| EST | A-DES | OTHER AUTH ABSENCE RETURN | 09-27-2019 | CURRENT |
| EST | A-DES | OTHER AUTH ABSENCE RETURN | 03-12-2019 | 09-27-2019 |
| EST | A-DES | US DISTRICT COURT COMMITMENT | 01-10-2017 | 03-12-2019 |

## Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 01-11-2017 |
| CARE2 | STABLE, CHRONIC CARE | 12-19-2011 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 12-19-2011 |
| YES F/S | CLEARED FOR FOOD SERVICE | 12-19-2011 |

## Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|

*NO ASSIGNMENTS*

## Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP UNQUAL | RESIDENT DRUG TRMT UNQUALIFIED | 04-22-2019 |
| ED NONE | DRUG EDUCATION NONE | 01-10-2017 |

## Physical and Mental Health Summary

Maximiliano Bonilla is assigned to CARE2 medical status and CARE1 mental health status. Upon release, he should be fully capable of full time work upon release from federal custody.

## FRP Details

| Most Recent Payment Plan |
|---|

| FRP Assignment: | COMPLT | FINANC RESP-COMPLETED | Start: 03-13-2018 |
|---|---|---|---|
| Inmate Decision: | AGREED | $25.00 | Frequency: QUARTERLY |
| Payments past 6 months: | $0.00 | | Obligation Balance: $0.00 |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

## Financial Responsibility Summary

Maximiliano Bonilla incurred a $100 felony assessment. He completed payment of his court ordered obligation.

## Release Planning

Maximiliano Bonilla was sentenced in the Eastern District of New York. Maximiliano Bonilla currently has an active detainer lodged by BICE for deportation. He is a citizen of Colombia. Upon release, it is expected he will return to his home country.

## General Comments



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: BONILLA, MAXIMILIANO  77018-053

SEQUENCE: 00138046

Report Date: 10-17-2019

Maximiliano Bonilla requested a progress report for review by Judge Sandra L. Townes.  This progress report indicates his adjust during this period of reporting.  It should be noted he continues to program and adjust in a positive manner.  He has never incurred an incident report since the start of his federal sentence.  He is not viewed as a management issue or concern.



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: BONILLA, MAXIMILIANO  77018-053

SEQUENCE: 00138046
Report Date: 10-17-2019

Name:  BONILLA, MAXIMILIANO
Register Num:  77018-053
Age:  47
Date of Birth:  09-24-1972
DNA Status:  MIM07250 / 12-15-2011

Inmate  (BONILLA, MAXIMILIANO, Register Num: 77018-053)

_10·18·19_
Date

_Chairperson_

_10.18.19_
Date

Case Manager

_10·18·19_
Date

Must humbly and respectfully I request Unit Manager Smith, to write a letter of recommendation to my Judge, Sandra L. Townes, which include the following:

(1) What kind of inmate I am according to staff supervision.
(2) My work detail evaluation and hours I have worked.
(3) Unit Team's evaluation according to my Inmate Discipline Data (Attached)
(4) Inmate Bonilla has succesfully completed the following Programs:
    (a) Victim Impact and Criminal Thinking
    (b) Inside Out Dad
    (c) Anger Management
    (d) Intro to Stock Marketing
    (e) Beginner Leather
    (f) Step Aerobics Fitness Class (April - June, 2017)
    (g) Weight Loss Fitness Class
    (h) Step Aerobics Fitness Class (October - December, 2017)
    (i) Yoga Class
    (j) Crossfit Fitness Class
    (k) Aerobic Fitness Class
(5) Inmate Bonilla has participated in the following events:
    (a) Make Amends Project's Second Annual Push-up-thon Fundraiser for Domestic Violence Awareness Month
    (b) Losses due to Addiction Open Mic Forum
    (c) 2019 National Crime Victim' Rights Week Event
    (d) Victim Awareness Event, featuring guest speaker from Hopeful Horizons
    (e) Attendance as a graduate member/guest speaker of the Victim Impact and Criminal Thinking Group
    (f) 12 Step Support Group, April 25, 2018
    (g) 12 Step Support Group, September 5, 2018
    (h) 12 Step Support Group, February 6, 2019
    (i) 12 Step Support Group, July 2, 2019
    (j) Books Up Drugs Down Program
(6) Inmate Bonilla has completed the following Self-Study workbooks from the Psycology Department
    (a) Core Skills

(b) Ending Our Resentments

(c) The Courage to Change: Responsible Thinking

(d) Feelings

(e) Substance Use Behaviors

(f) Family & Other Relationships

(g) The Courage to Change: Self-Control

(h) The Courage to Change: Social Values

(i) Mi Dario Personal

(j) Stress Management

(k) My Change Plan

(l) Disciplining Children With Love

(m) Coping Skills

(n) The Courage to Change: Substance Use

(o) Getting Started

(p) Living on the Outside

(q) Stop Smoking for Good

```
    ESTFY          *        INMATE DISCIPLINE DATA          *     10-03-2019
PAGE 001 OF 001 *     CHRONOLOGICAL DISCIPLINARY RECORD     *     10:55:05

REGISTER NO: 77018-053 NAME..: BONILLA, MAXIMILIANO
FUNCTION...: PRT         FORMAT: CHRONG    LIMIT TO ____ MOS PRIOR TO 10-03-2019
```

```
G5401        DISCIPLINE DATA DOES NOT EXIST FOR THIS INMATE
```



CERTIFIED MAIL

Maximiliano Bonilla-Orozco
Reg. No. 77018-053
FCI Estill
P.O. Box 699
Estill, SC 29918



7019 0700 0001 6194



UNITED STATES
POSTAL SERVICE®

1000



11201

U.S. POSTAGE PA
FCM LG ENV
ESTILL, SC
29918
OCT 30, 19
AMOUNT

**$0.00**

R2305K142413-06

⟺77018-053⟺
Patricia E Not
225 Cadman
Brooklyn Heig
United States

*Legal M*

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   NOV 05 2019   ★

BROOKLYN OFFICE



047

D

poulos Ausa
LZ E
ts, NY 11201